Mark R. Vermeulen [CSBN 115381]
Law Office of Mark R. Vermeulen
755 Florida Street #4
San Francisco, CA 94110.2044
Phone: 415.824.7533
Fax: 415.824.4833

Attorney for Defendant
BERNADETTE ESCUE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>   Plaintiff,<br><br>   v.<br><br>BERNADETTE ESCUE,<br><br>   Defendant. | No. CR 07-00610 JF<br><br>**DEFENDANT BERNADETTE ESCUE'S SENTENCING MEMORANDUM**<br><br>Date: May 8, 2008<br>Time: 1:30 p.m. |

## INTRODUCTION / OVERVIEW

Sentencing in the current era is significantly different than it was under the mandatory guidelines. Recent explications by the Supreme Court and the Ninth Circuit make clear that the District Court has considerable discretion and responsibility in imposing a sentence that is sufficient, but not greater than necessary, to achieve the goals of sentencing, taking into account the factors set forth in 18 U.S.C. § 3553(a) and guided by other relevant statutes and legal principles.

By this memorandum, counsel seeks to provide the Court with an overview of the essential principles applicable to sentencing. Counsel then applies these principles to this case.

In the end, in light of these principles and in light of the facts and circumstances of this case and this individual defendant, Ms. Escue respectfully requests that the Court impose a sentence which will allow her to maintain her recently-obtained employment so that she may begin to pay restitution and continue to re-establish herself as a productive member of society.

-1-

# ANALYSIS / ARGUMENT

## I. The Essential Principles And Framework For Determining A Reasonable, Appropriate Sentence[1]

Following the Supreme Court's decision in *Booker*, sentencing in the federal courts took on a new life. The recent explications in *Kimbrough v. United States*, 552 U.S. ---, 128 S.Ct. 558 (2007), *Gall v. United States,* 552 U.S. ---, 128 S.Ct. 586 (2007), and *United States v. Carty*, --- F.3d ---, 2008 WL 763770 (9th Cir. 2008) further establish the principles applicable to federal sentencing today.

### A. The Overarching Sentencing Mandate of Section 3553(a): The Parsimony Provision and the Purposes of Sentencing Control. The Advisory Guidelines Are Only One of Several Factors to be Considered, and No Presumption of Reasonableness Attaches to the Guidelines.

"The [federal sentencing] statute, as modified by *Booker*, contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary,' to achieve the goals of sentencing." *Kimbrough*, 128 S.Ct. at 570. As expressed by the Ninth Circuit (in the first bullet-point of the recent *Carty* decision), *Rita*,[2] *Gall*, and *Kimbrough* stand for the following, *inter alia*:

> The overarching statutory charge for a district court is to "impose a sentence sufficient, but not greater than necessary" to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. 18 U.S.C. § 3553(a) and (a)(2).

*Carty*, 2008 WL 763770 at *3.

In determining the sentence minimally sufficient to comply with the § 3553(a)(2) purposes of sentencing, the Court must consider the § 3553(a) factors "to decide if they support the sentence suggested by the parties, i.e., [the District Court] should consider the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed; the kinds of sentences available; the kinds of sentence and the sentencing range established in the Guidelines; any pertinent policy statement issued by the Sentencing Commission; the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims. 18 U.S.C. § 3553(a)(1)-(7)." *Carty*, 2008 WL 763770 at *4, citing *Gall*, 128 S.Ct. at 596-97 n.6.

---

[1] The Court is, no doubt, well-versed in the principles applicable to sentencing in the current era. The overview set forth here is provided because no such explication has been set forth previously on Ms. Escue's behalf.

[2] *Rita v. United States*, --- U.S. ---, 127 S.Ct. 2456 (2007).

-2-

DEF. ESCUE'S SENTENCING MEMORANDUM

The Guidelines, "formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence." *Kimbrough*, 128 S. Ct. at 564, 570; *Gall*, 128 S.Ct. at 594, 596-97, 602 ("[The] Guidelines are only one of the factors to consider when imposing sentence.").[3] "[The District Court] may not presume that the Guidelines range is reasonable. *See* [*Rita*], 551 U.S. at ---, 127 S.Ct. 2456. [The District Court] must make an individualized assessment based on the facts presented." *Gall*, 128 S.Ct. at 596-97; *accord Carty*, 2008 WL 763770 at *4 ("The district court may not presume that the Guidelines range is reasonable."), citing *Rita,* 127 S.Ct. at 2465; *Booker,* 543 U.S. at 259-60, 125 S.Ct. 738; *Gall,* 128 S.Ct. at 596-97.

The judge must independently evaluate the appropriate sentence in light of the Section 3553(a) purposes and factors, and must consider arguments that the guidelines should not apply on general policy grounds, case-specific grounds, or "regardless." *Rita*, 127 S. Ct. at 2463, 2467-68.

**B.     Sentences Outside the Guidelines Range Fully Comport with Federal Sentencing Law.**

In *Gall*, the Court "reject[ed] an appellate rule that requires 'extraordinary' circumstances to justify a sentence outside the Guidelines range." *Gall*, 128 S.Ct. at 595. The Court also "reject[ed] the use of a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence." *Id.* The Court made clear that Circuit Courts are not to impose their own judgment on what the appropriate sentence should be in any particular case, and the Ninth Circuit in *Carty* made clear its agreement with this principle, provided that the appropriate procedures are followed, the appropriate facts and circumstances are properly considered, the District Court makes an individualized determination based on the facts, and the District Court's reasoning is explained sufficiently to permit meaningful appellate review. *Carty*, 2008 WL 763770 at *3-*6. The *Carty* court set forth the following principles concerning outside-guidelines sentences, expressly derived from *Rita*, *Gall*, and *Kimbrough*:

> If a district judge "decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." [*Gall*, 128 S.Ct.] at 597. This does not mean that the district court's discretion is constrained by distance alone. Rather, the extent of the difference is simply *a* relevant consideration. At the same time, as the Court put it, "[w]e find it uncontroversial that a major departure should be supported by a more

---

[3] This is in line with the Court's earlier pronouncements in *Booker*, by which the Sentencing Reform Act "requires a sentencing court to consider Guidelines ranges, see 18 U.S.C.A. § 3553(a)(4) (Supp. 2004), but it permits the court to tailor the sentence in light of other statutory concerns as well, see § 3553(a)." *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 757 (2005).

significant justification than a minor one." *Id.* This conclusion finds natural support in the structure of § 3553(a), for the greater the variance, the more persuasive the justification will likely be because other values reflected in § 3553(a) - such as, for example, unwarranted disparity - may figure more heavily in the balance.

*Carty*, 2008 WL 763770 at *4 (emphasis in original).

On appellate review, the Circuit Court "must give due deference to the district court's decision that the § 3553(a) factors justify the extent of the variance." *Gall,* 128 S. Ct. at 597; *accord Carty,* 2008 WL 763770 at *6, citing *Gall*. Further, "applying a heightened standard of review to sentences outside the Guidelines range ... is inconsistent with the rule that the abuse-of-discretion standard of review applies to appellate review of all sentencing decisions – whether inside or outside the Guidelines range." *Id*. at 596. A "rule requiring 'proportional' justifications for departures from the Guidelines range is not consistent with our remedial opinion" in *Booker*. *Id*. at 594. An "appellate rule that requires 'extraordinary' circumstances to justify a sentence outside the Guidelines range," or the use of percentages to determine the strength of the justifications required "come too close to creating an impermissible presumption of unreasonableness for sentences outside the Guidelines range." *Id*. at 595.

### D. A Sentence of Probation Constitutes Punishment and Is an Option In Any Case In Which It Is Not Prohibited By Statute, Even Despite Contrary Guideline Calculations

The *Gall* Court disapproved of the Circuit Court's characterization of Gall's probationary sentence as a one hundred percent downward variance, in part because such a characterization gave no weight to the substantial restriction of liberty involved in even standard conditions of probation. The Supreme Court's explanation is instructive and apt:

> We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. See *United States v. Knights,* 534 U.S. 112, 119, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001) ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled.'" (quoting *Griffin v. Wisconsin,* 483 U.S. 868, 874, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987)). [Footnote omitted.] Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. U.S.S.G. § 5B1.3. Most probationers are also subject to individual "special conditions" imposed by the court.

*Gall*, 128 S.Ct. at 595-96 & n.4.

Further, as noted in *Gall*, "'a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking

-4-
DEF. ESCUE'S SENTENCING MEMORANDUM

into account the real conduct and circumstances involved in sentencing.'" *Id.* at 599, quoting district court opinion. Finally, the Court in *Gall* rejected the Circuit Court's conclusion that probation "lies outside the range of choice dictated by the facts of this case" because "§ 3553(a)(3) ['kinds of sentences available'] directs the judge to consider sentences other than imprisonment." *Id*. at 602 & n.11.

### E.   Additional Statutes That Provide Guidance In Sentencing

Other statutes provide further guidance in determining the appropriate sentence.

#### 1.   18 U.S.C. § 3582: Imprisonment Is Not An Appropriate Means To Promote Correction And Rehabilitation

Under § 3582, imposition of a term of imprisonment is subject to the following limitation:

> The court, in determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in section 3553(a) to the extent that they are applicable, *recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.*

Section 3582 (emphasis added).

#### 2.   18 U.S.C. § 3661: No Limitation On Information Court May Consider

Under § 3661, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

## II.   Application Of These Sentencing Principles To Ms. Escue's Case

### A.   Brief Factual Background of the Offense, the Pre-Filing Cooperation and Negotiations, and the Plea Agreement

As set forth more fully in the Plea Agreement and the Presentence Report, Ms. Escue violated 18 U.S.C. § 1343 by falsely and fraudulently charging personal expenses to her employer's corporate credit card account from February 2001 through October 2003. The total amount of funds falsely charged is just over $90,000.[4]

Ms. Escue was contacted by the FBI in July 2004. Soon thereafter she retained current counsel, who contacted the FBI agent and the first-assigned AUSA. Counsel quickly informed the AUSA and the FBI that Ms. Escue was admitting guilt, and counsel remained in close, regular contact with the AUSA as the parties undertook pre-filing plea discussions. These contacts and discussions continued with the first-assigned AUSA (who then was new to the US Attorney's Office) through late 2006. In early 2007, the newly-assigned (and current) AUSA, Joseph Fazioli, contacted counsel and informed

---

[4] The issue of restitution is addressed in greater detail in section II.D. at pp. 12-13, *post*, of this memorandum.

-5-

DEF. ESCUE'S SENTENCING MEMORANDUM

counsel that the case now had been assigned to him. Counsel for the parties continued their plea discussions. They specifically discussed, *inter alia*, the total loss amount (agreeing to the range set forth in the plea agreement) and the "abuse of trust" offense characteristic under U.S.S.G. § 3B1.3 (agreeing that it does not apply to this case, and intentionally omitting it from the plea agreement). In October 2007, the parties finalized the Plea Agreement, which is presently before the Court. As had been contemplated, Ms. Escue waived indictment at the initial hearing before the Magistrate Judge, entered the plea at the initial hearing before the District Judge, and had a sentencing date set.

**B.      Discussion of the Advisory Guidelines Range**

**1.      Calculation of the Advisory Guidelines Range**

Under §§ 3553(a)(4) and (5), *Gall,* and related authority, the guidelines and their advisory sentencing range are to be considered as a factor and the starting point in the Court's sentencing determination.

**a.      Offense Level**

**i.      Base Offense Level and Loss Amount**

The parties' determination of the Base Offense Level, using the 2007 version of U.S.S.G. § 2B1.1, was 7. However, the PSR notes that *ex post facto* issues are present[5] and, under the earlier (2002) version of the guidelines, the Base Offense Level is 6.[6] The parties agreed (and the Probation Officer concurs) that the loss exceeded $70,000 but was less than $120,000, resulting in an additional 8 levels (under either the earlier or later guidelines). Thus, under *ex post facto* principles, the Adjusted Offense Level would be 14.

**ii.      The Proposed "Abuse of Trust" Increase is Not Supported by the Law and the Facts of this Case**

The Probation Officer believes that an additional 2-level increase applies under U.S.S.G. § 3B1.3, positing that Ms. Escue abused a position of trust that significantly facilitated the commission or

---

[5] *See Miller v. Florida*, 482 U.S. 423, 107 S.Ct. 2446 (1987) (Supreme Court holds unanimously that the Ex Post Facto Clause bars the trial court from sentencing a defendant under a later, more punitive sentencing guideline amendment); *United States v. Cruz-Mendoza*, 147 F.3d 1069 (9th Cir. 1998); U.S.S.G. § 1B1.11(b)(1).

[6] In the communications involved in finalizing the PSR, the Government has taken the position that the defense has waived any *ex post facto* concerns and that any *ex post facto* concerns are *de minimus*, insubstantial and insignificant. Defense counsel has responded. Should the Government maintain its position on these points, counsel will be happy to respond substantively to the Court, for the law and the history of this case directly contradict the Government's position in this regard.

-6-

DEF. ESCUE'S SENTENCING MEMORANDUM

concealment of the offense. Counsel respectfully disagrees.[7] A review of the guidelines commentary and the case law demonstrates that this offense characteristic does not apply here.

Ms. Escue's former position as Travel Manager[8] in the company does not approach the examples set forth in § 3B1.3 which would otherwise cause the adjustment to apply: Her actions were not akin to "an embezzlement of a client's funds by an attorney serving as a guardian, [nor] a bank executive's fraudulent loan scheme, [n]or the criminal sexual abuse of a patient by a physician under the guise of an examination."). U.S.S.G. § 3B1.3, A.N. 1.

The case law further demonstrates that the proposed increase doesn't apply. The Ninth Circuit has stated clearly and consistently through a series of cases that for guidelines purposes, a position of trust is one in which the defendant has the freedom to commit a "difficult-to-detect wrong." *United States v. Isaacson*, 155 F.3d 1083, 1086 (9th Cir. 1998) ("As we explained in *United States v. Cuff*, [*United States v.*] *Hill*[, 915 F.2d 502 (9th Cir. 1990)] stands for the proposition that 'the critical inquiry is "the extent to which the position provides the freedom to commit a difficult-to-detect wrong."' 999 F.2d 1396, 1397 (9th Cir. 1993) (quoting *Hill*, 915 F.2d at 506)."). The wrong committed here was not at all difficult to detect, and the position didn't provide otherwise.[9] Rather, the wrong wasn't detected because there was apparently little or no oversight given to Ms. Escue's expenses. A cursory review of her expenses at any time would have shown the expenses to be questionable. The case law makes clear that in such instances, there is no basis for a guidelines increase. *Hill*, 915 F.2d at 505 ("If a person is in

---

[7] As noted *supra*, defense counsel and the AUSA specifically discussed this potential offense characteristic in their plea negotiations, and agreed that it does not apply.

[8] The title attributed to Ms. Escue by others has, curiously, evolved in the course of this litigation. In the draft PSR, the Probation Officer denoted Ms. Escue's position as, variously, "Travel Manager" (the correct title), "Global Transportation Manager," and "Global Travel Manager." When defense counsel pointed out this discrepancy in the objection/editing process (noting the correct title), the final title appeared as "Corporate Travel Manager," a title that never appeared before.

[9] The Probation Officer posits that since the consulting/auditing group hired by Network Appliance states that they could not conclusively prove that some suspicious expenses were personal, this was a difficult-to-detect wrong. *PSR*, *Addendum*, p. 3, ¶10. This is incorrect as a factual matter and as a legal matter. Network's own report shows the bulk of these "suspicious but not proven" items to be shipments or items which clearly are personal in nature, rather than having a business purpose: The large value shipments in this category are for clothing or home items from The Company Store, The Territory Ahead, and Travelsmith Outfitters, and for goods purchased through QVC. Moreover, the number and amount of expenses denoted as suspicious but not proven is a small minority of the total. The fact that the consulting firm says these transactions were suspicious but not conclusively proven does not make them difficult-to-detect under the guidelines and under Ninth Circuit precedent, and does not support an abuse of trust increase.

-7-

DEF. ESCUE'S SENTENCING MEMORANDUM

a relationship such that any attempt by a defendant to abuse the relationship could be simply or readily noticed by the second party to the relationship, presumably the two persons have not formed a 'trust' relationship."). Similarly, a supervisor's laxity in supervising a person does not transmute that person's position to a position of trust for guidelines purposes. *United States v. Helton*, 953 F.2d 867 (4th Cir. 1992) (a defendant's position does not become a position of trust simply because the defendant's supervisor was lax and never audited defendant's account from which the defendant embezzled money).

These legal principles do not place blame on the supervisor, nor on Network Appliance, nor do they excuse Ms. Escue's actions. They simply mean that the legal requisites for an "abuse of trust" increase are not present.

Further, § 3B1.3 does not apply by its own terms for another, separate reason: Any use of the position did not "significantly facilitate the commission or concealment of the offense," which also is required for the increase to apply. U.S.S.G. § 3B1.3, & *Background*. *See also, United States v. Christiansen*, 958 F.2d 285, 288 (9th Cir. 1992) ("abuse of trust" enhancement may be applied only when the position of trust contributed in some substantial way to facilitating the crime; "substantial" means that in addition to the elements of the crime, the defendant exploited the trust relationship to facilitate the offense), citing and quoting *Hill*, 915 F.2d at 505.

The proposed "abuse of trust" increase is not supported by the law and the facts of this case. It should not be included in the guidelines calculations.

### iii. Acceptance Of Responsibility

In light of *ex post facto* considerations, the calculations for the offense level do not reach 16, so Ms. Escue is entitled to only a two-level reduction for acceptance of responsibility.[10]

### iv. Total Offense Level

Using the above calculations, the following apply:

| | |
|---|---:|
| Base offense level | 6 |
| Loss amount increase | +8 |
| Acceptance of responsibility | -2 |
| Total Offense Level | 12 |

### b. Criminal History

Ms. Escue has no criminal history. Her Criminal History Category is I.

---

[10] As noted elsewhere, Ms. Escue very early, clearly, and consistently has acknowledged and accepted responsibility and has done everything within her power to resolve this matter expeditiously and responsibly.

-8-
DEF. ESCUE'S SENTENCING MEMORANDUM

### c. Advisory Guidelines Range

Based on a Total Offense Level of 12 and a Criminal History Category of I, the advisory guideline range would be 10-16 months, in Zone C of the Sentencing Table.

## C. Discussion of the Other Sentencing Factors Set Forth in § 3553(a)

Post-*Booker*, the Court is obliged to refrain from giving "special weight" to any single factor such as the guidelines, and even under the guidelines, the Ninth Circuit has made it clear that previously disapproved-of factors, such as family ties and responsibilities (U.S.S.G. § 5H1.6), may now be considered. *See United States v. Garcia,* 497 F.3d. 964 (9th Cir. 2007). There is "[n]o limitation ... on the information concerning the background, character, and conduct of the defendant which a court of the United States may receive and consider for the purposes of imposing an appropriate sentence." 18 U.S.C. § 3661.[11]

The sentencing factors set forth in § 3553(a) fairly can be said to fall into three general categories: The nature of the offense, the history and character of the defendant, and the needs of the public and the victims of the offense. *See United States v. Ranum*, 353 F.Supp.2d 984 (E.D.Wis. 2005).

As set forth below and in the PSR, relevant information includes the facts of the offense and Ms. Escue's attitude and remorse in addressing the offense, her personal history, her medical situation, her parents' medical situation and the circumstances and needs surrounding the care of her parents, Ms. Escue's financial situation (including her very recent commencement of a full-time permanent position), and the needs of the public and the victim in this case.

### 1. Nature Of The Offense

The nature of the offense is serious. Ms. Escue misappropriated a large amount of money over a significant period of time.[12] She understands and acknowledges that her conduct was wrong and illegal, and she has expressed sincere shame and remorse for her actions.

---

[11] *See Garcia*, 497 F.3d. 964; *see also, United States v. Nellum*, 2005 WL 300073, *4 (N.D.Ind. 2005); *United States v. Ranum*, 353 F.Supp.2d 984, 990 (E.D.Wis. 2005) (discussing the defendant's family circumstances); *United States v. Myers*, 353 F.Supp.2d 1026, 1031-32 (S.D.Iowa 2005) (same); *see also United States v. Smith*, 359 F.Supp.2d 771, 782 (E.D.Wis. 2005). All of these cases hold that the Court must now consider factors, such as the defendant's family ties, health or age, that were effectively precluded from consideration under the mandatory guidelines regime.

[12] It also is clear that the conduct involved here constitutes the full extent of her wrongdoing, given the attention devoted by Network Appliance in determining the applicable loss, given the concomitant investigation by the FBI, and given the further, more recent review of Ms. Escue's finances by the Probation Office.

-9-

DEF. ESCUE'S SENTENCING MEMORANDUM

In fairness, it also must be noted that Ms. Escue did not undertake additional actions (beyond those used to fraudulently take the funds) to conceal her actions or to make them undetectable. Further, she admitted guilt at a very early (pre-filing) stage of the proceedings, she waived indictment and pled guilty at the earliest opportunity, and she has expressed a strong desire to make this right in whatever ways she can.

### 2. History And Character Of The Defendant

#### a. Ms. Escue's Personal History

Ms. Escue has no criminal history. This is her first encounter with the law, and it will be her last.

She was brought up in a lower middle class family in the Bay Area. Her personal family history includes significant trauma at a young age and over a considerable period of time. *See* PSR at ¶¶ 42-43. As noted in the PSR, Ms. Escue is very reticent to delve into this issue in any further depth in connection with these proceedings; it obviously still impacts her significantly. *See, e.g.,* PSR at ¶ 54.

She has one child, from a previous marriage. Upon the divorce in 1989, she became essentially the sole financial provider for her son (who was then 9 years old). PSR at ¶ 44. She devoted herself fully to his upbringing, and she and her son continue to maintain a close and supportive relationship. *Id.*, as confirmed in ¶¶ 47-48.

#### b. Ms. Escue's – and her Family's – Medical Situation

Ms. Escue's personal medical issues are significant, stabilized by ongoing medical treatment and medications, which are closely monitored. PSR at ¶¶ 50-51. Her family's medical history raises additional issues of concern for her health. PSR at ¶ 52. Her mental and emotional health issues also are significant and interrelated, and she has been proactive in addressing them by, for example, devoting herself to weekly, ongoing therapy sessions, which she began in 2004. PSR at ¶¶ 53-54. All of these conditions, and Ms. Escue's program of care, would be impacted significantly if she were incarcerated.

Her parents are elderly and in poor health, with limited mobility. PSR at ¶ 40. Ms. Escue and her brother (her sole sibling) are their parents' care givers, sharing the necessary care, tasks and support. PSR at ¶ 41.

#### c. Ms. Escue's Remorse

Ms. Escue's remorse is genuine and considerable, as demonstrated, *inter alia*, at the plea hearing, and as confirmed by close friends. PSR at ¶¶ 47-48; *see also* letters of support/reference submitted as Exhibit A. She has had to face up to and address this matter as a legal matter since August 2004, when she was first approached by the FBI.

-10-

DEF. ESCUE'S SENTENCING MEMORANDUM

**d.    Ms. Escue's Financial Situation: Poor, with Recent Hope**

Her financial situation is poor. PSR at ¶¶ 66-67. She recently sold her house at a significant loss, going further into debt. PSR at ¶ 46. She has had difficulty obtaining employment and maintaining long-term employment since this investigation broke. PSR at ¶¶ 59-62.

However, she very recently was offered and began a full-time permanent position as an account manager for an established Internet company.[13] She will be managing the corporate relationship between the company and its clients, advising on their corporate travel programs and opportunities. While the company is headquartered in Seattle, all of the account managers (of which there are nineteen nationwide) work "virtual;" i.e., from their homes or home offices, rather than at the company's offices. This is a great opportunity for her. If the Court permits her to maintain this employment, she will again be able to earn a steady living and she will be able to begin to pay restitution in this matter.

**3.    Needs Of The Public And The Victims Of The Offense**

Section 3553(a) directs that in imposing "a sentence sufficient, but not greater than necessary," the Court's sentence is to comply with the purposes set forth in paragraph (2) of the subsection, which are stated as follows:

> (2) [T]he need for the sentence imposed—
>> (A) [Retribution:] to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (B) [Deterrence:] to afford adequate deterrence to criminal conduct;
>> (C) [Incapacitation:] to protect the public from further crimes of the defendant; and
>> (D) [Rehabilitation:] to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

Section 3553(a)(2).

Of additional significance in this case, section 3553(a)(7) directs that the Court "shall consider ... the need to provide restitution to any victims of the offense."

Retribution and punishment are appropriate, and Ms. Escue will leave to the Court's judgment the extent of punishment necessary, considered in conjunction with the other purposes of sentencing. Counsel respectfully requests that in making this judgment, the Court be mindful of the Supreme Court's explication in *Gall* (set forth, *ante*), which holds and makes clear that probation (with its substantial

---

[13] Pursuant to the recent order permitting travel, Ms. Escue was able to attend her new employer's orientation program, per the Court's authorization (and with the approval of the AUSA and Pretrial Services, for which she is very appreciative). *See* Doc. 24 & 26 (travel application and order).

-11-

DEF. ESCUE'S SENTENCING MEMORANDUM

restrictions on liberty) constitutes punishment. *See Gall,* 128 S.Ct. at 595-96 & n. 4. Counsel also notes that Ms. Escue has lived with the difficulties and stress of this legal matter since mid-2004, and that any delay in resolving this has not been her doing.

In terms of deterrence and incapacitation, Ms. Escue has been and will continue to be deterred and incapacitated from re-offending by the restrictions the Court will place on her liberty, regardless the sentence. As to general deterrence, she will again leave that to the Court's judgment.

In terms of rehabilitation, incarceration is not necessary to provide Ms. Escue with educational or vocational training (given her current skills and employment), and incarceration would be counter-productive to her (and her parents') medical situations.

In terms of restitution, Ms. Escue's new employment provides a real opportunity for her to earn a living and to begin to pay restitution. Incarceration would impact this aspect immediately and directly by forcing her to resign her job, and it would impact her long-term as well, given the difficulties of the job market, both as a general matter and as she's experienced personally in recent years.

### D.  Determining Restitution Fairly and Reasonably

Counsel addresses here – separately – the determination of restitution. Counsel does so because of the importance of this issue to the case, and because of the manner and extent by which it very recently has been proposed that restitution be increased dramatically and, in counsel's view, unjustifiably and unreasonably.

Since this case broke in 2004, the Government, Network Appliance and its auditing/consulting group have always stated that restitution was less than or very near $100,000. In 2003 or 2004, Network hired the Huron Consulting Group to audit Ms. Escue's expenses when the fraudulent charges came to light. In 2004, Network and Huron produced to the Government and defense counsel a report detailing Huron's findings. As noted in the report, the amounts at issue ranged from a possible low of $88,163 to a possible high of $112,259 (with the latter proving to be inaccurate, as it included duplicative and inapplicable items). The claim submitted by Network to its insurer totaled $90,297, for which Network was paid $40,297.53 (after subtracting the $50,000 deductible). *See* Exhibit B (letter dated August 6, 2004 from Chubb Group of Insurance Companies to U.S. Attorney's Office, and the *Release and Assignment* dated July 26, 2004).

In early March 2008, in connection with finalizing the PSR, the parties and the Probation Officer undertook further discussions and communications regarding the determination of restitution. The Probation Officer (working from notes from the AUSA and his agents) stated that she believed that $95,619.21 was the appropriate figure, and defense counsel noted that he believed that $90,297 was

-12-
DEF. ESCUE'S SENTENCING MEMORANDUM

applicable, given the documentation.  *See* Exhibit C (March 3, 2008 email communications between defense counsel, the AUSA and the Probation Officer, addressing restitution).  The AUSA referred to documents that indicated that restitution may be as high as the $95,619.21 figure, and indicated that he would take a look at the documents to determine his position.  *Id.*  He never responded further; nor did the Probation Officer.

When the final PSR was issued in April 2008, it contained confirmation that $90,297.53 was the loss.  PSR at ¶ 16.  However, it also included a proposal for additional restitution of $126,684 as fees for the Huron Consulting Group.  PSR at ¶¶ 16-17.  While Huron had provided the 2004 report from which all parties had been working since the inception of this matter, never before had this additional proposed restitution been mentioned or alluded to by anyone.  Further, the newly proposed additional $126,684 is grossly disproportionate to the $90,297.53 loss.

The fees sought by Huron are unreasonable and exorbitant, and the manner and timing by which they have been presented to this Court is exceedingly dilatory at best.  They should not be approved as restitution.  Restitution fairly and reasonably should be based on the $90,297.53 loss.[14]  If anything above the long-discussed $90,297.53 figure is to be approved, it should be limited strictly to the $10,000 figure effectively agreed to by Network and its insurer as the maximum reasonable cost for such services (*see* PSR at ¶ 16).  Anything more would be wholly unreasonable.[15]

/ / /

/ / /

---

[14] The issue of offset arises, as Network was reimbursed $40,297.53 by its insurance company.  PSR at ¶ 16; *see also* Exhibit B.  While insurance payments are excluded from the initial computation of the amount of restitution owed, once that total amount is determined, the defendant is entitled to have the amount of restitution reduced by any amount recovered by the victim as compensation for the same loss.  *United States v. Crawford*, 169 F.3d 590, 593 (9th Cir. 1999), citing 18 U.S.C. § 3664(j)(2) (no offset allowed in *Crawford* because there was no evidence establishing that the insurance proceeds received by the victim's family were intended to compensate for "the same loss" (i.e., funeral expenses, which were the basis for the court ordered restitution)).

[15] The Court's attention also is called to U.S.S.G. § 5E1.1(f) (2002), which states:

> § 5E1.1  Restitution
>
> (f) A restitution order may direct the defendant to make nominal periodic payments if the court finds from facts on the record that the economic circumstances of the defendant do not allow the payment of any amount of a restitution order and do not allow for the payment of the full amount of a restitution order in the foreseeable future under any reasonable schedule of payments.

-13-

DEF. ESCUE'S SENTENCING MEMORANDUM

**CONCLUSION**

Given the holdings of the Supreme Court and the Ninth Circuit, along with the particulars of this case, the sentence imposed by this Court will be the final word. The sentencing choice comes down to what the Court deems is sufficient but not greater than necessary. While this *Sentencing Memorandum* contains many details, the essence of Ms. Escue's request comes down to a plea that the Court not incarcerate her, but rather, that the Court allow her to continue to work in her new job and to restore herself as a productive member of society by imposing a term of probation with whatever conditions and restrictions the Court deems necessary, including (should the Court deem it necessary) a condition requiring home detention for a period of time.

Dated: May 1, 2008                           Respectfully submitted,


                                             /S/
                                             Mark R. Vermeulen
                                             Attorney for Defendant
                                             BERNADETTE ESCUE

**DECLARATION OF COUNSEL**

I, Mark R. Vermeulen, declare as follows:

1. I am an attorney admitted to practice before this Court and I represent Defendant Bernadette Escue.

2. I have represented Ms. Escue since she was contacted by the FBI in 2004 in connection with this matter. The facts and circumstances of my contacts and communications with the US Attorney's Office and others in connection with this matter are set forth truly and accurately in this *Sentencing Memorandum*.

3. Filed with this memorandum as the following exhibits are true and correct copies of the following:

- Exhibit A: Letters of support/reference
- Exhibit B: Letter dated August 6, 2004 from Chubb Group of Insurance Companies to U.S. Attorney's Office, confirming insurance claim and payment of $90,297, and *Release and Assignment* dated July 26, 2004 from Network Appliances (confirming insurance payment of $40,297.53 & deductible of $50,000)
- Exhibit C: March 3, 2008 email communications among defense counsel, the AUSA and the Probation Officer, addressing restitution

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on May 1, 2008 at San Francisco, California.

/S/ _____
Mark R. Vermeulen